[Crim. No. 16819. In Bank. Jan. 16, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED JAMES STEPHENSON, Defendant and Appellant.

## COUNSEL

Fred James Stephenson, in pro. per., and R. William Shpall, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McCOMB, J.**—Defendant, Fred James Stephenson, was charged by information in counts I and III with robbery in violation of Penal Code section 211 (victims Virgil del Bucchia and Walter E. Anderson); in counts II, IV, and VI with kidnaping for the purpose of robbery, in violation of Penal Code section 209 (victims del Bucchia, Walter E. Anderson and Evelyn Anderson); and in count V with rape in violation of Penal Code section 261, subdivision 3 (victim Evelyn Anderson).[1] He pleaded not guilty, and, together with all counsel, waived trial by jury. The court found him guilty on all charges, denied probation and ordered that he be punished in the state prison for the term prescribed by law on each count. Execution of sentence as to count I was ordered stayed, such stay to become permanent and final on completion of service of sentence on count II; execution of sentence as to count III was ordered stayed, to become permanent and final on completion of service of sentence on count IV; execution of sentence as to count VI was ordered stayed to become permanent and final on completion of service of sentence on count IV; sentence on count V was ordered to run concurrently with counts II and IV; and sentences on counts II and IV were ordered to run consecutively.

The principal issues raised on this appeal are the sufficiency of the

---

[1] All references herein are to the Penal Code unless otherwise stated.

evidence to support convictions of two counts of *first degree* robbery; the sufficiency of the evidence to support convictions for *three counts of kidnaping for the purpose of robbery;* the sufficiency of the evidence to identify defendant as the perpetrator of the crimes committed against del Bucchia; and whether defendant was denied effective or adequate representation by counsel at the trial and on the appeal.

A discrepancy in the record is noted with regard to the court's fixing of the degree in counts I and III (robbery). The clerk's transcript shows that the degree was fixed in the first degree on these counts. The reporter's supplemental transcript shows that at the sentence hearing (Feb. 14, 1972) the trial court determined that the degree was "first degree" on these counts and sentences were pronounced thereon. Following an off-the-record colloquy the court stated "We will have to vacate and start over. I just made an error. Thank you for bringing it to the Court's attention. We will start over. The Court will proceed with Count II . . . ." After considering count II the court proceeded to consider count I and then the other counts, but it failed to fix the degree as to either count I or III. The matter must be resolved in favor of the court's statement as reflected in the reporter's supplemental transcript rather than the clerk's version thereof as reflected in the clerk's transcript (see *People* v. *Blackburn* (1968) 261 Cal. App.2d 554, 559-560 [67 Cal.Rptr. 918]). Upon failure of the trial court to determine the degree it is deemed to be of the lesser degree (§ 1192). There is no merit in defendant's contention that the convictions on counts I and III are void because the court failed to determine the degree. (See *In re Harris* (1967) 67 Cal.2d 876 [64 Cal.Rptr. 319, 434 P.2d 615].) The sentences on those two counts are deemed to be of the second degree. (§ 461.)

Our review of the record indicates that the evidence is sufficient to support all convictions except counts II and IV and as to those counts only the judgment is reversed. We find no deprivation of effective assistance of counsel.

*Facts:* All counts stem from incidents occurring on October 2 and 7, 1971, commencing at the Los Angeles International Airport, and incriminate defendant as the person who offered to give rides to the victims herein, and who thereafter committed the crimes charged.

Virgil del Bucchia, aged 73, arrived from Italy at the airport about 9 p.m. on October 2. A man approached him calling "Taxi, Taxi." Del Bucchia asked if he would take him to Glendale, the man answered "yes" and del Bucchia got into the man's car. After riding for a while del Bucchia commented "You are going too far. I think this is not the way to Glendale."

The man replied "Well, I take you to Glendale" and they kept on going without further protest. However, the man stopped the car on the 8900 block of Figueroa Street, took del Bucchia's wristwatch from his arm and his money ($2,000 cash plus some foreign money), made him take off his shoes, and struck him in the face many times. The man then pulled the victim from the car and drove off, also taking his leather box and suitcase. The victim hollered for help, someone called the police, and he was taken to the hospital.

Walter Anderson and his wife, Evelyn, arrived from Hawaii at this airport on October 7 about 10:30 p.m. They missed their bus to Pasadena, would have had to wait another hour for another bus, and decided to accept the offer of a bystander who introduced himself as "Henry Miller." The man said he had to go to Pasadena to pick up a "Mr. Carter" and bring him back to the airport, and that he would be glad to take the Andersons to Pasadena for a few dollars. They accepted and he carried their heavier luggage and put it in a car parked in the brightly lit luggage area by the curb. Anderson got in back and his wife in front. The Andersons were surprised when the man drove past the entrance to the Harbor Freeway but the man reassured them that he was taking a shortcut, that he had driven the route for years and that he knew what he was doing. The Andersons became suspicious when he began making right turns and left turns about 10 minutes later but instead of protesting they held hands and silently indicated to each other that they would "kind of wait until we got wherever we were going." The car was proceeding at a reasonable rate of speed. A stop was made at a dead-end street but the man said "Oh, I made a mistake, I should have turned on Carson." He drove back along Century to 114th Street and then stopped a second time,—this time at a "T dead-end intersection." Anderson saw the man pull something from the console and put it under his shirt but did not see what it was. Mrs. Anderson heard a "clatter of metal against metal" and also saw the man put his hand under his shirt. Neither saw a gun or weapon. Each was frightened.

The man told Anderson "You son-of-a-bitch. I'm right off San Quentin. I have nothing to lose. Give me your wallet." Anderson did as he was told. The man made them both get out of the car and remove the luggage. He came around and stood by them, then told Anderson to run fast and not turn around or "I will kill your wife." Walter ran slowly about 25 paces, then turned and saw the man forcing Mrs. Anderson back into the car. A householder witnessed the car pulling up to the curb and Anderson removing the suitcases. She called the police for him.

Mrs. Anderson was frightened when made to get back into the car. She

began talking to the man as they drove away and said "Look, we don't have very much. You can have anything we have, but please don't hurt me." He said he would not hurt her if she did not lie to him. After five or six blocks he stopped the car in an alley, took the money out of Anderson's billfold, handed the empty billfold to her, and *asked for her money*. She had only one dollar and she handed it to him, but he handed it back. He then made her get into the back seat, take off her clothes, and lie down. He committed an act of sexual intercourse on her. When it was over he said "Get out. Hurry" and drove off while she was attempting to put her clothes on and decide what to do.

Defendant was arrested under the following circumstances. There had been six robbery-kidnap incidents at the airport prior to October 13 and on the 13th there were several Los Angeles Police Department officers. there on special investigation. Officer Mattison saw a man who appeared to him to answer the description of the suspect. He first observed the man walking on the sidewalk in front of the United Air Lines baggage terminal, saw him stop briefly and appear to talk to two persons standing on the sidewalk, and then saw him walk east and stop in front of a pedestrian standing on the curb in front of the terminal. Mattison was some 20 feet away from this last encounter, did not hear any words, did not know if any words were spoken by either, but he did see the pedestrian shake his head from side to side as if saying "No." He then watched defendant walk to an employees' parking lot, get into a 1967 Pontiac with a black vinyl top and green body and drive away. The license number proved to be that of defendant. Mattison later identified the man as defendant.

A picture of defendant was obtained and shown to the victims. Prior thereto each of the Andersons had been separately shown photographs on three occasions but neither had selected any of them as depicting the man who committed these crimes. On October 15 she identified defendant's picture from a group of seven photographs shown to her. Her husband identified two out of a group of seven, stating that one of them was the man; and one of these was a picture of defendant. Del Bucchia picked defendant's picture out of a group of seven.

On the evening of October 15, 1971, the officers staked out parts of the airport and also watched defendant's home. Officer Malone observed defendant's car parked in front of a liquor store and arrested him as he emerged from the store and entered the vehicle. Malone advised defendant of his rights and told him that his car would be impounded. Defendant asked the officers to remove some valuables from his trunk, and they found therein two rings and some dice. When they asked for consent to

search his residence he consented, saying "I have nothing to hide." He was driven to his home and there the officers found two watches,—one was gold with a leather strap and "foreign" writing on the front and back and del Bucchia later identified this as being the watch taken from him, one he had bought in Italy two years earlier. He recognized the watchband, and it fit his wrist when he strapped it in the worn fourth hole.

Defendant testified at the trial in support of his defense of alibi, producing several witnesses. He said that he had won the watch in a gambling game on October 8 or 9 and that his occupation was gambling and selling rings at the airport. Upon being questioned by the police he had at first denied having been at the airport recently, then admitted he had gone there twice,—once to take "Gloria" there and, once again October 13th, the night he was observed by the officers at the airport, when he had gone there to pick up Gloria but she was not there. When asked where "Mr. Carter lived" he replied "Out in Pasadena someplace."

Although del Bucchia made an extrajudicial pretrial identification of defendant, identifying his picture as one of the seven shown to him prior to the filing of charges, he was unable to identify defendant at the preliminary hearing or at the trial. The trial court concluded that del Bucchia could not identify defendant but that there was sufficient circumstantial evidence including the modus operandi to sustain the People's burden of proof and that the evidence offered by defendant did not create a reasonable doubt in the mind of the court as to defendant's perpetration of the robbery of del Bucchia. The Andersons separately identified defendant from photographs prior to the trial and made in-court identifications.

■ Substantial evidence supports the conclusion of the trier of fact, and the conviction of defendant for the second degree robbery of del Bucchia (count I) and of Anderson (count III) must be affirmed. We need not decide, since the court failed to fix the degree, whether the evidence would have supported *first degree* robbery in either count.

The evidence supports defendant's conviction of the kidnaping of Mrs. Anderson for the purpose of robbery (count VI) but does not support his conviction of kidnaping for such purpose of her husband or of del Bucchia (counts II and IV). ■ The distinction is that Mrs. Anderson *was forcibly* required by defendant to get into his car against her will and that he transported her several blocks for the purpose of committing robbery, and then raped her. ■ The two men, and originally Mrs. Anderson, were enticed to get voluntarily into defendant's car by deceit or fraud. Although defendant's intent to commit the crimes of robbery against each may reasonably be inferred from the evidence of what later transpired, he did

not forcibly require any of them to enter his car initially. The offenses charged in counts II and IV do not meet the statutory definition of kidnaping (§ 207).

Section 209 of the Penal Code makes kidnaping to commit robbery a felony and prescribes the punishment therefor. However, section 207 defines "kidnaping" and, as we pointed out in *People* v. *Rhoden* (1972) 6 Cal.3d 519 [99 Cal.Rptr. 751, 492 P.2d 1143], this definition distinguishes among three separate kinds of conduct which it characterizes as kidnaping. "The general definition characterizes kidnaping as the act of one who '*forcibly* steals . . . any person in this state and carries him into another country, state, or county, or into another part of the `same county'; the special definitions refer to the act of a person (1) 'who hires, persuades, entices, decoys, or seduces *by false promises, misrepresentations, or the like,* any person to go out of this state . . . with the intent to sell such person into slavery,' or (2) 'who, being out of this state, . . . takes by force *or fraud* any person contrary to the law of the place where such act is committed, and brings, sends, or conveys such person within the limits of this state . . . .' (Italics added.) ¶ As the emphasized language makes clear, the Legislature has thus deliberately provided that whereas the two special types of kidnaping (transportation out of state for sale into slavery; unlawful transportation into state for any purpose) can be accomplished by means of fraud, a general act of kidnaping . . . can only be accomplished by the use of threat or force." (Pp. 526-527.) ■ Under the two-prong test stated in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], an aggravated kidnaping conviction is improper (1) where the movement of the victim is merely incidental to the commission of the offense otherwise involved and (2) where the movement of the victim does not substantially increase the risk of harm to him over and above that necessarily present in the underlying crime itself.

■ The reentry and movement of Mrs. Anderson was against her will and was accomplished by means of threats and fear. ■ While the statute requires force as an operative act (*People* v. *Guerrero* (1943) 22 Cal.2d 183, 189 [137 P.2d 21]; *People* v. *Dagampat* (1959) 167 Cal.App. 2d 492, 495 [334 P.2d 581]) the force need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances. (*People* v. *Dagampat, supra,* 167 Cal.App.2d 492, 495; *People* v. *Broyles* (1957) 151 Cal.App.2d 428 [311 P.2d 88]; *People* v. *Thompson* (1967) 252 Cal.App.2d 76, 88 [60 Cal.Rptr. 203].)

■ After defendant forced Mrs. Anderson to reenter the car and drove her away from her husband, he took the money out of her husband's wallet and then asked her for her money. Although he gave her back the one dollar she had with her, the evidence was sufficient to prove that she was forcibly kidnaped for the purpose of robbery. Defendant's conviction of count VI must therefore be affirmed.

■ No double punishment of defendant results by reason of his conviction of counts V and VI. Section 654 provides that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." While the two acts charged in these counts occurred within a short space of time they were separate and distinct acts and constituted separate and distinct crimes.[2]

Defendant was represented at the preliminary hearing and at the trial by counsel, and by separate counsel on appeal. He has also filed numerous petitions in propria persona in the trial court and on appeal. He has asked this court to consider his claim that he was denied effective representation of counsel at the preliminary hearing and at the trial, and to also consider his claim that he has been denied effective representation of counsel on appeal because his appellate counsel has failed to urge this issue in this court.

■ Where trial counsel fails to make careful inquiries and investigations which result in withdrawing a crucial defense from the case he deprives the defendant of the assistance to which he is entitled. (*People v. Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; *People v. Shells* (1971) 4 Cal.3d 626 [94 Cal.Rptr. 275, 483 P.2d 1227].) ■ If appellate counsel fails to urge crucial assignments of error on appeal, he deprives defendant of the assistance on appeal to which he is entitled. (*In re Smith* (1970) 3 Cal.3d 192, 202-203 [90 Cal.Rptr. 1, 474 P.2d 969].) ■ The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof of this inadequacy or ineffectiveness must be a demonstrable reality and not a speculative matter. (*People v. Ferguson* (1969) 1 Cal.App.3d 68, 77 [81 Cal.Rptr. 418]; *People v. Tomita* (1968) 260 Cal.App.2d 88, 94 [66 Cal. Rptr. 739].) He fails to support his contentions.

---

[2]If the evidence had been sufficient to sustain defendant's conviction of counts II and IV (kidnaping for purpose of robbery) [herein reversed] it would have constituted "double punishment" for defendant to also be convicted of counts I and III (robbery) of the same victims because the asportation involved was incidental to the underlying crime of robbery. (*People v. Timmons* (1971) 4 Cal.3d 411, 414-416 [93 Cal.Rptr. 736, 482 P.2d 648].)

The record on appeal has been augmented to include the transcript of the preliminary hearing. We have independently searched the record and we find no merit in defendant's allegations that he has been denied effective representation of counsel either at the trial or on appeal. The record demonstrates that defendant received a fair trial and one in which no prejudicial error was committed.

The convictions of defendant under counts II and IV are reversed. The judgment is otherwise affirmed.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.